## Case No. 501.

### The ARABELLA.

[2 Gall. 368.][1]

Circuit Court. D. Massachusetts. May Term, 1815.

PRIZE — CAPTURED PROPERTY LYING IN NEUTRAL PORT—REMOVAL OF GOODS—MASTER AND SHIP'S PAPERS—EVIDENCE—CONDEMNATION.

1. The prize courts of a belligerent may take jurisdiction of property captured by its cruisers,

---

[1][Reported by John Gallison, Esq.]

while such property is lying in a foreign neutral port.

[Cited in Hopner v. Appleby, Case No. 6,699; Jecker v. Montgomery, 13 How. (54 U. S.) 516.]

2. It is the duty of captors to bring in the master of the captured ship, and the ship's papers. An omission to do this must be fully and satisfactorily explained to the Court, otherwise it will withhold condemnation.

See The Bothnea and Janstoff, [Case No. 1,-686.]

3. The removal of prize goods is an irregularity, but is indulged under certain circumstances.

[Cited in The Ella Warley, Case No. 4,371.]

4. How far the want of regular evidence may be supplied by the affidavits or written declarations of the captured.

[Cited in Waring v. Clarke, 5 How. (46 U. S.) 477.]

5. Of the mode of sale and distribution, in case of condemnation, of prize goods lying in a foreign neutral port.

In admiralty. The British ships Arabella and Madeira were captured, in June, 1814, by the private armed brig Rambler, Edes commander; and thirty boxes of medicines, sixteen bales of piece goods, five boxes of opium, and seventy-five casks of Madeira wine, parcel of their cargoes, were removed on board of the Rambler, carried into the port of Canton, in China, and there landed. On the 7th day of April, 1815, a prize allegation was filed in the district court against the same goods and merchandise, praying condemnation thereof as enemy's property, while lying in the neutral port of Canton. The usual monition having been returned, at the hearing of the cause, certified copies of the affidavits of the master and mate of the Arabella, sworn to before the American consul at Canton, were produced, in which there was a most explicit avowal, that the whole property was British. Certified copies of the written declarations of the master and mate of the Madeira, drawn up and signed at sea after the capture, were also produced, in which were contained similar avowals. No ship's papers, or documentary evidence of property, had been lodged in the registry, and the only other evidence in the cause was a copy of the protest of the prize master of the Arabella, stating the circumstances of her subsequent recapture by the British. No claim having been interposed in the district court, a pro forma decree was rendered, from which the captors appealed to this court.

A. Townsend, for the captors, now moved the court, upon the evidence above stated, to proceed to condemnation. The court having taken time for advisement, the following opinion was delivered by

STORY, Circuit Justice. The first question which presents itself, is, whether the court has jurisdiction to proceed to the adjudication of prize property, lying in a for-

eign neutral port. This question has been discussed with much ability and learning in the admiralty courts of Great Britain, and has there been finally settled in the affirmative, not so much upon the supposed correctness of the principle, as the general usage of nations. It was there admitted, that condemnation of prize property, lying in the ports of an ally in the war, was strictly justifiable; but it was thought, that a different rule might apply to neutral ports. The Henrick and Maria, 4 C. Rob. Adm. 43; The Christopher, 2 C. Rob. Adm. 207; The Victoria, 1 Edw. Adm. 97; The Comet, 5 C. Rob. Adm. 285. In the courts of the United States, the question has received a solemn decision, and it has been held, that upon principle a condemnation of a prize, lying in a neutral port, is valid, and may be rightfully decreed by the prize jurisdiction. Hudson v. Guestier, 4 Cranch, [8 U. S.] 293, 6 Cranch, [10 U. S.] 281. And the correctness of this decision is evidently presupposed in several provisions of the prize act. Act June 26, 1812, c 107, § 6, [2 Stat. 761.] If, therefore, I felt any lurking doubts on the subject, I should feel myself bound by authority. But I am free to declare that, after much reflection, I am entirely satisfied, that the doctrine is founded in national law.

The next consideration is, whether the court ought now to proceed to adjudication. in the absence of the regular testimony and documentary evidence, required in prize causes. The court always demands from the captors a compliance with the requisitions of the prize statute and the public instructions; and watches, with great jealousy, every deviation from them. Whenever such deviations occur, the court requires the most satisfactory proof, that they were unavoidable, or at least justified by very cogent and pressing reasons. It is an ancient and fundamental rule of prize proceedings, enforced by the president's instructions, that the master of the captured ship should be brought in and examined upon the standing interrogatories, and that the ship's papers should accompany the property brought before the court. I do not say that the rule is inflexible, for cases may and do occur, in which the omission has not been allowed to work any injurious consequences. But the omission must be accounted for in a satisfactory manner, or the court will withhold its sentence even in very clear cases. The Anna, 5 C. Rob. Adm. 373, and note, page 385f. The transaction, indeed, in the present case, having taken place in a remote part of the world, the absence of the regular testimony of the enemy's masters may be easily accounted for; and, under such circumstances, I should have no difficulty in admitting their affidavits, taken before some proper authority in the neutral country. Such a proceeding is by no means unusual. The Peacock, 4 C. Rob. Adm. 185, 191. But here

even such original affidavits are not produced. Copies only are offered of the affidavits and certificates of the enemy's masters and mates, and no reason is assigned for the non-production of the originals. In respect to the certificates of the master and mate of the Madeira, there is this further objection, that they gave them while they were at sea, as prisoners, on board of the capturing ship. Nor is there any reason assigned, why their testimony was not afterwards taken, as was done in the case of the Arabella. Certainly, the certificates of hostile persons, while prisoners of war on board of an enemy's ship, are liable to some suspicion, for they may have been procured by duress or by fraud. I do not mean to suggest any doubt of the purity of the transaction in the present case. On the contrary, I have many reasons to presume it to have been entirely fair. But the court would surrender all its discretion, if it could permit captors to act with such irregularity, and not require a plenary explanation of the manner, in which it happened, and of the circumstances which may excuse it. It would hold out temptations to gross misconduct in captors, and subject the prize tribunals to unjust accusations of connivance in breaches of national law. Our duty also, in respect to the interests of neutrals, requires us to act with caution. and to afford no just pretext for dissatisfaction in administering the maritime rights of war.

There is another irregularity, which indeed has become so general in practice, and has so far obtained the silent acquiescence of public opinion, that it seems almost to have been thought to have ripened into a right, I allude to the removal of the goods from prizes on board of the capturing ship. This is in direct contravention of the express provisions of the prize act, which require, that before bulk is broken, or the prize property is otherwise disposed of or converted, it shall be brought in and proceeded against before some competent tribunal. This provision was undoubtedly designed more immediately for the security of neutrals; but it is also a useful restraint, even as to enemy's property, inasmuch as it has a tendency to prevent embezzlements and frauds, and to aid the regular operation of the revenue laws. In relation, however, to neutrals, it is of the highest importance; as their property, especially on board of enemy's ships, would otherwise be liable to every species of hazard, and often to irretrievable ruin. Courts of prize are therefore bound to hold the captors to very strict scrutiny, whenever cases of removal of goods occur, and to take every precaution to guard against the abuses growing out of the practice. I do not say that a removal is in no case to be allowed, unless of necessity, though perhaps the prize act might, at first view, seem to warrant that rigorous construction. In point of practice, however, even in the British courts,

where a similar statutable direction exists, a more indulgent rule has been adopted. Where property has been captured on a remote station, or under circumstances calling for a removal, sale or other conversion, or even a delivery on bail, on the ground of some great inconvenience, the act has been held valid upon the proper explanations being made, and condemnation has been pronounced in favor of the captors. The Peacock, 4 C. Rob. Adm. 185, 191; The L'Eole, 6 C. Rob. Adm. 220, 224; La Dame Cecile, 6 C. Rob. Adm. 257, 260; The Falcon, 6 C. Rob. Adm. 194, 200.

In respect to our own country, considering the character of the war, in which we have been engaged; the great naval force of the enemy; and the consequent difficulty of bringing prizes into our ports; it has not been thought unreasonable to hold, that a removal of prize goods into the capturing ship, if not strictly justifiable, is at least excusable. I trust it is no want of proper decorum to assert, that this conduct seems to have received the favorable consideration even of the government itself. It has been deemed consistent with the national policy, to interpose no obstacles to such proceedings; and to leave the courts of law to make the most liberal interpretations in such cases, in favor of the captors. Under these circumstances, a uniform practice has prevailed in all the courts of the United States, to proceed to adjudication of prize property without any other regard to the fact of its transhipment, than as it called for a most exact examination of the proprietary interest. Still, however, after every indulgence, the transhipment is deemed an irregularity, and at the peril of the captors, who become ultimately responsible to the court for all its consequences.

I have thought it proper to state thus much, in order to vindicate the court from the imputation of lending its aid to great irregularities without reasonable cause. In every case, what shall be the effect of any irregularity must depend upon the sound discretion of the court, acting upon an enlarged and liberal policy. Cases may occur of such gross misconduct, that it might be proper to apply the penalty of a forfeiture of the right of the captors to the United States. I profess not to see in the present case any circumstances, which may not entitle the parties to the most benign indulgence of the court. What I shall at present do is, to suspend judgment, and to require of the captors affidavits of the facts, which shall explain the irregularities, to which I have alluded.

NOTE, [from original report.] On a subsequent day of the term, the affidavit of the commander of The Rambler, stating the circumstances, having been produced, condemnation was decreed. A sale was ordered to be made under the direction of the court. It was stated, that any mode of sale, that might be agreed upon by the captors, would be sanctioned by the court. And that, up-

on receipt of an account of sales, it might be filed in court, and distribution would be decreed accordingly.